**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DIANNA COLEMAN** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 21-47** |
| | : | |
| **COMMUNITY BEHAVIORAL** | : | |
| **HEALTH** | : | |
| **and** | : | |
| **KIMBERLY DOYLE** | : | |
| **and** | : | |
| **ANDREW DEVOS** | : | |

---

**McHUGH, J.**                                                                      **January 6, 2022**

**MEMORANDUM**

This case involves claims of race discrimination and retaliation, brought by an African American woman who worked for a non-profit organization for approximately one month before she was terminated. Plaintiff alleges that her termination was racially discriminatory and in retaliation for having reported racial discrimination. Because Plaintiff fails to show evidence linking the treatment she complains of to her race, a reasonable jury could not find for Plaintiff on her discrimination claims. There are, however, material issues of fact regarding Plaintiff's retaliation claim, such that a reasonable jury could find that Plaintiff's termination was retaliatory. Defendants' Motion for Summary Judgment will therefore be granted as to Plaintiff's race discrimination claims but denied as to her claims of retaliation.

## I.       Factual and Procedural Background

Plaintiff Dianna Coleman brings claims for race discrimination and retaliation under Title VII, 42 U.S.C. §2000e-2(a), Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, the Pennsylvania Human Relations Act (PHRA), 43 PA. STAT. §§ 951 et seq., and the Philadelphia

Fair Practices Ordinance (PFPO), Phila. Code §9-110 I et seq.  Pl.'s Second Am. Compl. ("SAC"), ECF 21 ¶¶ 26-33.

Defendant Community Behavioral Health (CBH) is a non-profit that provides mental health and substance abuse treatment services to uninsured, underinsured, and Medicaid-eligible residents throughout the greater Philadelphia area.  *Id*. ¶ 9.  Plaintiff has also named as Defendants her direct supervisor at CBH, Kimberly Doyle, and the Chief Program Officer at CBH, Andrew Devos.  *Id*.  ¶¶ 9-11, 16.

On November 19, 2019, Ms. Coleman had an in-person interview with Kimberly Doyle and Andrew Devos for the position of Manager of the Provider Network Management at CBH. Pl.'s Br., ECF 23-1, Ex. C.  Ms. Doyle's interview notes state that, "Dianna presented in a professional manner and was able to clearly articulate a clear understanding of CBH and vision for the manager's position.  Demonstrated strong leadership skills, multiple years in a supervisory position, along with a true passion for community, mental health work."  *Id.*   Ms. Doyle and Mr. Devos, who are both white, offered Plaintiff the position.  Defs.' Br., ECF 18-1 at 4.  She accepted and began working at CBH on January 27, 2020.   Coleman Dep. 57:3-8, ECF 18-3, Ex. 1.  CBH terminated her employment roughly one month later, on February 25, 2020.  SAC ¶ 23.

During her short tenure with CBH, Plaintiff alleges that she experienced a pattern of behaviors and events, culminating in her termination, that, taken together, constituted racial discrimination.  Coleman Dep. 168:2-7; 178:2-5.  First, she avers that she was unfairly targeted for counseling.  She alleges that her direct supervisor, Ms. Doyle, counseled her for (1) eating during a meeting, *id.* at 104:21-105:11; (2) wearing hats and jeans to work, *id.* at 105:18-24; (3) arriving late to meetings twice; *id.* at 213:17-214:24, and (4) taking an emergency phone call during a meeting, *id.* at 109:21-111:16.   According to Ms. Coleman, some of these events did not

occur – for instance, she denies eating during a meeting and wearing jeans to work.  *Id.* at 105:16-17; 106:15.  Moreover, she alleges that non-Black employees regularly engaged in such behavior but did not receive similar counseling.  Pl.'s Br., ECF 23 at 7.  Second, Plaintiff asserts that she was treated dismissively by Ms. Doyle and two of Plaintiff's supervisees.  Coleman Dep. 106:17-107:16.  For example,  she alleges that two of her staff regularly refused to make eye contact with her.  *Id.*  Third, she reports being deprived of a variety of resources appropriate to her position: (1) she never received a company phone, although other employees at her level had company phones, *id.* at 107:18-108:15; (2) she was denied a space heater for her office on the grounds that it was hazardous, but was told that prior occupants had a space heater, *id.* at 108:16-109:20; (3) she was not given access to her supervisees' calendars or payroll, *id.* at 111:22-113:7; 121:8-18; and (4) she was not provided with the company's protocol which she needed to complete her job, *id.* at 124:16-126:9.  Finally, she alleges that employees made two comments at meetings which, although not explicitly mentioning race, were racially insensitive.  *Id.* at 113:16-120:10.

    In her role at CBH, Ms. Coleman supervised three employees: Laura York, a white woman, York Dep. 23:22-24, ECF 18-7, Ex. 11; Amal El-Nageh, who describes herself as a Havanan woman,[1] El-Nageh Dep. 19:7-8, ECF 18-7, Ex. 12; and Shine Thomas, an Asian Indian male, Thomas Dep. 10:11-12, ECF 23-1, Ex. L.  It is undisputed that Ms. Coleman had a strained relationship with Ms. York and Ms. El-Nageh.  Coleman Dep. 106:17-107:16; Doyle Dep. 135:8-136:2, ECF 18-5, Ex. 6.  As discussed above, Plaintiff believed that they treated her rudely.

---

[1] The record is inconsistent regarding Ms. El-Nageh's race or ethnicity.  I use Havanan, as that is how Ms. El-Nageh responded to the question "What's your race or ethnicity?" in her deposition.  El-Nageh Dep. 19:7-8, ECF 18-7, Ex. 12.  Defendants refer to her as Egyptian.  ECF 18-1 at 5.  Plaintiff refers to her as Caucasian in her email to CBH, her EEOC Charge, and throughout her litigation filings, but during her deposition Plaintiff denied knowing Ms. El-Nageh's race and, somewhat confusingly, stated that she did not think that Ms. El-Nageh was Caucasian during her employment.  Coleman Dep. 94:22-96:1.

Coleman Dep. 107:1-2; 162:13-23.   And Ms. York and Ms. El-Nageh testified that they felt uncomfortable on various occasions based on what they perceived as Plaintiff's inappropriate personal discussions and physical space intrusions.   York Dep. 34:10-35:18, 40:12-41:21; El-Nageh Dep. 34:16-39:19.  For example, Ms. El-Nageh reported that Plaintiff kept her in a one-on-one meeting until after 6 pm, after she had previously explained that she could not stay past 5 pm due to family commitments, and asked her a number of personal questions unrelated to work that Ms. El-Nageh found "unprofessional, [and] inappropriate." [2]   El-Nageh Dep. 33:23-34:9, 39:15-19.

Ms. Doyle, after receiving negative feedback from at least one[3] of Plaintiff's subordinates, and observing Ms. Coleman's behavior herself,[4] began to doubt that Plaintiff was demonstrating an ability to establish good relationships of  mutual respect with the people that she supervised. Doyle Dep. 102:19-24.   Ms. Doyle communicated Ms. York and Ms. El-Nageh's concerns to Plaintiff.  Coleman Dep. 180:19-21; Doyle Dep. 106:1-9.  She also informed Ms. Coleman that, due to these complaints, Ms. Coleman could no longer meet with her team members one-on-one. Coleman Dep. 181:3-6.

---

[2] Plaintiff disputes that she engaged in some of the behavior leading to these complaints.  Coleman Dep. 305:8-307:8.  It does not appear that Plaintiff was asked about her meeting with Ms. El-Nageh in her deposition.

[3] Ms. Doyle reports receiving complaints about Ms. Coleman from all three of Plaintiff's direct reports. Doyle Dep. 103:1-4, 129:15-19, Cert. of Kimberly Doyle, ECF 23-1, Ex. K ¶ 11,12,18.   Only some of those employees confirmed that they had communicated their concerns to Ms. Doyle.  Ms. El-Nageh reports that she told Ms. Doyle that she felt uncomfortable.  El-Nageh Dep. 39:15-19.  Ms. York asserts that while she felt uncomfortable with Ms. Coleman's behavior, she does not recall whether she shared her concerns with Ms. Doyle. York Dep. 32:15-17, 34:10-12.  Mr. Thomas denies feeling uncomfortable or reporting negative comments to Ms. Doyle.  Thomas Dep. 14:17-16:8.

[4] Ms. Doyle found Ms. Coleman's communication style, which she described as often short and dismissive, to be "ineffective" and concerning.  Doyle Dep. at 114:15-115:14.

In addition to the team leadership issues, Ms. Doyle became concerned the Plaintiff did not understand the scope of her job responsibilities, wanted to focus on visions outside the framework of the position, insufficiently understood the quantitative aspects of her position, and did not indicate a willingness to learn. Doyle Dep. 116:2-6, 119:8-121:15. Echoing these concerns, Mr. Devos, after observing Plaintiff in meetings, also began to worry that Plaintiff was struggling with role clarity. Devos Dep. 31:11-18, 32:8-9, ECF 18-6, Ex. 7.

Due to these issues, Ms. Doyle approached Sean Regan, CBH's Employee Relations Manager, early in Plaintiff's employment to express her fear that Plaintiff was not a good fit for her role. Regan Dep. 6:21-7:5, 28:13-31:14, ECF 18-8, Ex. 13; Doyle Dep. 127:20-128:11. Mr. Regan instructed Ms. Doyle to allow Plaintiff more time to acclimate and to provide her with support. Regan Dep. 29:22-30:4. Sometime later, Ms. Doyle again reported to Mr. Regan that her concerns about Ms. Coleman had not been resolved. Regan Dep. 33:8-19; Doyle Dep. 130:17-23. Mr. Regan advised Ms. Doyle that should these problems continue, they would discuss termination in accordance with CBH's Introductory Period policy, which governs the first 90 days of employment. *Id.* at 33:8-38:15.

On Thursday, February 20, 2020, Mr. Devos met with Plaintiff to check in and discuss her job duties. During the meeting, Mr. Devos reported emphasizing the quantitative aspects of Ms. Coleman's job, as there "was a concern that she was not understanding that aspect." Devos Dep. 25:21-26:6, 31:4-32:9. Plaintiff alleges that Mr. Devos informed her that he was "pleased" with her "knowledge base in such a short period of time" and that it would take time to learn her job. Coleman Dep. 224:18-225:7. He also told her that he was excited about her ideas, her knowledge of CBH, and her role within the company. *Id.* at 225:4-11.[5] Although Plaintiff felt discriminated

---

[5] Mr. Devos testified that he does not recall if he told Plaintiff that he thought she was learning her role. Devos Dep. 27:11-15.

against by her team at that time, Plaintiff did not mention any concerns about being discriminated against during her meeting with Mr. Devos.  *Id*. at 276:1-5.

Later that day, Ms. Doyle and Plaintiff also met to discuss the dynamics between her and her subordinate employees.  During this meeting, Plaintiff expressed concerns about the unfair treatment she received from her team, including their lack of eye contact, lack of communication, and refusal to grant access to their calendars.  She alleges telling Ms. Doyle that, "I felt like I was being treated unjust and unfair based on my race.  So yes, I told her I was—felt like I was being discriminated against by my team."  Coleman Dep. 165:15-19, 166:4-6, 168:5-7.[6]  Doyle and Plaintiff agreed to hold a team meeting on Tuesday, February 25, 2020 for Plaintiff to express her concerns to Ms. York and Ms. El-Nageh.  *Id.* at 163:24-164:2.

On Monday, February 24, 2020, Plaintiff and Doyle met again.  During that meeting, Ms. Doyle asked Ms. Coleman if she thought that Ms. Doyle had discriminated against her.  Coleman Dep. 236:1-2.  In reply, Coleman stated that she had already talked to her about the issues she experienced and that she would like to meet with everyone at the same time to discuss her concerns the next day, as planned.  *Id*. at 236:3-7.

On February 25, 2020, the scheduled team meeting did not occur.  Instead, Plaintiff met with Ms. Doyle and Mr. Regan, at which time, they terminated her employment.[7]  Coleman Dep.

---

[6] The record is unclear as to whether Plaintiff reported that Ms. Doyle was a member of the "team" who discriminated against her.  When asked "Did you tell Ms. Doyle that you believed that she was discriminating against you based on your race, along with your staff?" Plaintiff responded that she told Ms. Doyle the "entire team, with the exception of Shine, was discriminating against me based on my race.  Yes." Coleman Dep. 168:2-7.

[7] It is undisputed that CBH employees took internal steps to initiate Plaintiff's termination.  Devos Dep. 44:14-18; Regan Dep. 42:4-20; Doyle Dep. 134:22-135:7, 138:14-17.  Plaintiff places significant weight on the fact that the record is somewhat inconsistent regarding the exact individual who made the decision to terminate her.  *See* Pl.'s Brief at 11-12.  For example, Mr. Regan testified that Ms. Doyle spoke with CEO Donna Bailey, a Black woman, to receive approval regarding the termination, Regan Dep. 42:4-20, while Ms. Doyle testified that it was Mr. Regan who spoke with Ms. Bailey, Doyle Dep. 134:22-135:7, although she did admit to speaking with Ms. Bailey about the termination at some point.  *Id*. at 138:14-17.

216:9-18.  They advised Plaintiff that her employment was at-will and that they had decided to terminate her because they lacked confidence in her leadership abilities and were concerned about her failure to acclimate to her position. *Id.* at 217:18-25; Regan Dep. 45:6-17.  Plaintiff believes that she was terminated based on racial discrimination and in retaliation for having complained about racial discrimination to Ms. Doyle the week prior.  Coleman Dep. 231:9-21.

Two days later, on February 27, 2020, Plaintiff emailed CBH complaining about her termination and pointing out inconsistencies in her treatment.  ECF 18-8, Ex. 16.  In her email, she referenced her race, stating that maybe she was not a "good fit" at CBH because of the color of her skin, her dreadlocks, or the fact that her appearance was not traditional and conservative enough.  *Id.*  In response to the email, Mr. Regan conducted an internal investigation, which ultimately found that Plaintiff had not been subjected to discriminatory treatment.  ECF 18-8, Ex. 17.  This suit followed.

## II.    Standard of Review

This Motion is governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as amplified by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

---

CBH maintains that the termination was "a collaborative process which was solely initiated by Ms. Doyle," with Ms. Bailey approving the decision, which also involved the Human Resources Department.  Defs' Reply Brief, ECF 24 at 3.  Defendants argue that this collaborative process and the involvement of HR suffices to explain any variation among individuals named as decision makers for the termination. *Id.*

### III.     Discussion

A.  <u>Plaintiff's Race Discrimination Claim</u>

Title VII forbids an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race."  42 U.S.C. §2000e-2(a)(1).

In the absence of direct evidence of discrimination, as here, the *McDonnell Douglas* burden-shifting analysis applies to claims brought under Title VII, §1981, the PHRA, and the PFPO.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *Brown v. J. Kaz, Inc.,* 581 F.3d 175, 181–82 (3d Cir.2009) ("the substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII."); *Jones v. SEPTA,* 796 F.3d 323, 327 (3d Cir. 2015) (cleaned up) (applying the same framework to claims brought under Title VII and the PHRA); *Vandergrift v. City of Phila.,* 228 F. Supp. 3d 464, 486 n. 206 (E.D. Pa. 2017) (quoting *Fogleman v. Mercy Hosp., Inc.,* 283 F.3d 561, 567 (3d. Cir. 2002)) (analyzing claims under the PFPO under the same framework as Title VII and PHRA claims).

Under *McDonnell Douglas's* three-step framework, (1) a plaintiff must first establish a prima facie case of discrimination; (2) if she does, the employer must give a legitimate reason for its conduct; and (3) if the employer meets its burden, the plaintiff must show the employer's proffered reason is pretextual.  *Jones*, 796 F.3d at 325-26.

a.  <u>Plaintiff's *Prima Facie* Case</u>

To establish a *prima facie* case of termination based on race discrimination, a plaintiff must show that (1) she belongs to a protected class, (2) she is qualified for the position, (3) she is subject to an adverse employment action, and (4) the circumstances support an inference of discrimination.

*McDonnell Douglas Corp,* 411 U.S. at 802-03, *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). Here, CBH concedes two of the elements: (1) Plaintiff is African American and thus, a member of a protected class and (2) she was qualified for the position. Defs' Br., ECF 18-1 at 21 n.6. Her employment was terminated, which clearly constitutes an adverse employment action.[8] Thus, the only remaining question before me is whether the record supports an inference of discrimination with respect to Ms. Coleman's termination.

As the party opposing summary judgment, Ms. Coleman must point "to sufficient cognizable evidence to create material issues of fact concerning every element as to which the nonmoving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 643 n.3 (3d Cir. 1998). Ms. Coleman alleges that a "pattern of behaviors, and interactions, and events" give rise to an inference of discrimination. But Plaintiff relies entirely on her own assumptions that her treatment was based on race and provides no evidence of racial animus or favorable treatment of similarly situated comparators based on race. Because there are no questions of material fact regarding whether she was discriminated against on the basis of race, her *prima facie* case fails.

Ms. Coleman highlights the following examples as demonstrating an inference of discrimination. First, she alleges she was falsely accused of violating company policies and

---

[8] To the extent that Plaintiff also alleges that her treatment while she was still an employee, such as being unfairly counseled or deprived of a company phone or space heater, constitutes adverse employment action, this argument fails because her allegations are not serious or tangible enough to constitute adverse action. Although the Court of Appeals has stated in dictum that "a wide panoply of adverse employment actions may be the basis of employment discrimination suits under Title VII of the Civil Rights Act and 42 U.S.C. § 1981," *Clark v. Twp. of Falls,* 890 F.2d 611, 618-19 (3d Cir. 1989), the discrimination must be "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004); *see also Grooms v. City of Philadelphia,* No. CV 17-2696, 2018 WL 4698856, at *5 (E.D. Pa. Sept. 28, 2018) (counseling and false accusations do not qualify as adverse action).

unfairly counseled.  Specifically, she cites her counseling with Ms. Doyle for eating during a meeting,[9] wearing jeans and hats to work, arriving late to meetings, and taking an emergency call during a meeting.  Plaintiff maintains that she did not eat during a meeting or wear jeans to work, though she admits to being late, wearing hats, and taking an emergency call.  She alleges that she was unfairly singled out for such counseling, as she saw other employees engaging in the same behaviors.  She has not, however, identified other managers in her department supervised by Ms. Doyle that wore hats or jeans, took emergency calls, or arrived late to meetings with third parties. Coleman Dep. 148:3-4, 15-24; 187:7-9; 214:14-18. The sole exception is Mark Elsasser, a white male manager also supervised by Ms. Doyle who she says she saw eat during meetings.  *Id.* at 133:20-22.  But she admits that she does not know if the meetings contained external parties.  *Id.* at 134:24-135:2.  Plaintiff further concedes that she has no personal knowledge as to whether anyone she witnessed engaging in the same behavior ever received counseling.  *Id.* at 130:12-24; 149:14-19; 186:23-187:9.  Most significantly, the parties agree that while Plaintiff was informally counseled for these behaviors, she was not disciplined, and thus any disparate treatment in counseling did not contribute to her termination.  *Id.* at 128:2-4 (no discipline for eating); 143:14-16 (no writeup for jeans); 186:15-22 (no discipline for phone call); 214:10-13 (no discipline warning for being late); Doyle Dep. 148:22-149:7 (counseling was not disciplinary).

Plaintiff's second argument—that she was racially discriminated against by her staff, as evidenced by their rude behavior towards her— is similarly weak.  That is so because nothing in the record supports a finding that their treatment of her was because of her race.  To support her position, Plaintiff alleges that her team members were unfriendly.  Coleman Dep. 106:17-107:17.

---

[9] There are some minor disputes as to the substance of the actual counseling.  For example, Plaintiff alleges that Ms. Doyle told her she should never eat in meetings, Coleman Dep. 135:4-8, while Ms. Doyle maintains she limited this instruction to meetings with external providers, Doyle Dep. 99:1-3.

She seeks to link this poor treatment to her race by noting that Ms. El-Nageh, Plaintiff's subordinate, once behaved rudely to another Black female employee during a meeting. *Id.* at 120:11-22. Assuming this to be true, one instance of behavior not directed towards the Plaintiff made by a non-decisionmaker should not be given great weight. *See Fuentes v. Perskie,* 32 F.3d 759, 767 (3d Cir. 1994).

Moreover, Plaintiff's assertion that racial discrimination can be inferred because she was denied company resources, such as a company phone and space heater, is undermined by the surrounding context. Plaintiff admits that two of the women on her level (also supervised by Ms. Doyle) with company phones are African American women, Coleman Dep. 182:16-23, which weakens any inference of racial discrimination. So too does the fact that she had only been at the company for one month without receiving a phone. Further, Plaintiff could not identify the races of anyone previously placed in her office who allegedly received a heater. *Id.* at 182:24-184:2. Plaintiff's complaints about being denied access to company protocol similarly fail because she admits to having access to the company's intranet, which contained all relevant policies. *Id.* at 124:24-126:5. Plaintiff's argument that she was not given access to ADP payroll or her supervisees' calendars, hindering her ability to do her job, *id*. at 111:22-113:7; 121:8-122:8, is undermined by her concessions that her supervisees never complained that they were not paid on time, *id*. at 190:5-9, that she was not disciplined for her inability to access payroll information, *id.* at 189:20-25, and that her supervisees themselves directly provided her with information about their schedules. *Id*. at 253:20-24. Finally, Ms. Doyle's decision that Ms. Coleman could not meet with her supervisees one-on-one is not evidence of racial discrimination, as Ms. Doyle had received report(s) that Ms. Coleman made her supervisees uncomfortable for reasons unrelated to race.

Ms. Coleman also cites two comments at meetings which she felt were racially insensitive as evidence of discrimination.  First, she contends that CBH employees laughed after Ms. El-Nageh joked during a meeting that a residential treatment facility (which serves predominantly Black children) should be placed near a prison.  Coleman Dep. 117:7-120:9.  Second, Plaintiff asserts that Ms. Doyle told her she could not advise a provider about school evaluation options, which Plaintiff believed was premised on the assumption that Black youth could not succeed in school.[10]  *Id.* at 113:16-117:6, 200:5-202.  Plaintiff may have been offended by these comments, but they were not directed at her and did not mention race explicitly.  And while comments that do not mention race explicitly can of course sometimes be evidence of racial animus, the connection here is too attenuated for a reasonable juror to find such an inference.  In that regard, Ms. Coleman further acknowledges that no CBH employee ever made any offensive or derogatory comments regarding African American people.  Coleman Dep. 178:6-179:18.

Ultimately, Plaintiff has only her own assumption and belief that her disparate treatment and termination were on the basis of race, which is insufficient to create a genuine issue of material fact.  *See* Coleman Dep. 178:2-5 (admitting that she assumes her treatment was because of race); *Wiest v. Tyco Elecs. Corp.,* 812 F.3d 319, 328 (3d Cir. 2016) (stating that "conjecture and speculation will not create a genuine issue of material fact sufficient to withstand the grant of summary judgment"); *Merke v. Lockheed Martin*, 645 F. App'x 120, 124 (3d Cir. 2016) (non-precedential) (granting summary judgment where African American plaintiff provided no evidence that his race played a role in how he was treated at work or why he ultimately was laid off, other than his own subjective opinion that he received disparate treatment because of his race).

---

[10] Plaintiff admits that no one suggested that Black youth would fail.  Coleman Dep. 205:12-14.

The lack of a *prima facie* case by itself would warrant summary judgment.  I will however complete the *McDonnell Douglas* analysis, as Plaintiff's cases suffers from other deficits as well.

### b.   Defendants' Legitimate Non-Discriminatory Reason

Assuming Ms. Coleman could state a prima facie case, the burden would then shift to the defendant employer to articulate a legitimate and non-discriminatory reason for taking the adverse employment action.  *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994).  Once Defendant meets this "relatively light burden," the burden of production shifts back to the plaintiff who must show that each of the employer's reasons are pretextual.  *Id.*

Defendants argue that Plaintiff was terminated during her introductory period based on legitimate concerns that she was not properly suited for her position, as evidenced by her management approach, her failure to grab certain concepts necessary to perform her position, and her insufficient focus on the quantitative aspects of her role.  Defs.' Br., ECF 18-1 at 1-2, 10, 24-25; Doyle Dep. 135:8-136:2; Regan Dep. 43:7-10.  There is sufficient evidence in the record from which a factfinder could reasonably accept these reasons.

### c.   Plaintiff Fails to Show Employer's Proffered Reasons were Pretextual

The burden then "shifts back to the employee, who, to defeat a motion for summary judgment, must show that the employer's reason was a pretext for intentional discrimination." *Doe v. C.A.R.S. Prot. Plus, Inc.,* 527 F.3d 358, 364 (3d Cir. 2008).  To do this, the plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes,* 32 F.3d at 764.  On either count, Ms. Coleman's claims fail.

"To discredit the employer's proffered reason, . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken . . . ." *Id*. at 765. Rather, the plaintiff "must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Keller v. Orix Credit Alliance, Inc*., 130 F.3d 1101, 1109 (3d Cir. 1997). Stated differently, Plaintiff must identify "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Fuentes,* 32 F.3d at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 531 (3d Cir. 1992)).

To prove that CBH's reason for firing her was a pretext for intentional discrimination, Plaintiff notes that she had not been issued any discipline nor did she miss any deadlines or perform poorly on assignments. Pl.'s Br., ECF 23 at 12; Doyle Dep. 136:3-11. She also highlights that she was replaced by Ms. El-Nageh, who was not a member of her protected class, and who previously applied for the position at the same time as Ms. Coleman but was not selected. Pl.'s Br., ECF 23 at 11.

In addition, Ms. Coleman attempts to prove pretext by pointing to certain inconsistencies in the record. First, Ms. Doyle reported that Plaintiff's supervisee, Shine Thomas, complained about Ms. Coleman's supervision. Mr. Thomas, however, denied having problems with Plaintiff or ever complaining about her during his deposition. Second, Plaintiff disputes engaging in the behavior that formed the basis of Ms. Doyle, Ms. York, and Ms. El-Nagdeh's complaints. Third, Plaintiff argues that she could not have been terminated on the basis of her job performance, as Mr. Devos specifically told her a mere five days prior to her termination that he was happy with her performance and understood that she would need time to learn how to perform her job. Fourth,

14

Plaintiff highlights some factual inconsistency over who participated in the decision to terminate her, noting that various CBH employees name different people as the decision maker.[11]

Plaintiff argues that a factfinder could use these inconsistencies to find the company's stated reasons were pretextual and render a verdict for Coleman.  "[T]he finding that the employer's explanation was pretextual need not be the necessary conclusion, but only a possible one." *Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 640 (3d Cir. 1993).  Plaintiff attempts to use the sum of these inconsistencies to cast suspicion on Defendants' professed reasons, invoking *Fuentes v. Perskie,* 32 F.3d at 764 n.7: "If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder," as the employer's credibility may be impeded enough that a reasonable juror may rationally disbelieve the remaining reasons.

Several factors, however, are fatal to Plaintiff's attempt to prove pretext.  The inconsistencies that Plaintiff cites are not genuine disputes of material fact such that a jury could find for Plaintiff, because none of the inconsistencies suggest discrimination based on race.  If in fact Shine Thomas never complained to Ms. Doyle, it may suggest that Ms. Doyle is embellishing her testimony, but that still does not show racial animus.  Separately, Ms. El-Nageh admits complaining to Doyle about Plaintiff's behavior.  Elsewhere in the record, Ms. Henderson, another Black Manager at Plaintiff's level, testified that Ms. El-Nageh also complained to her about Plaintiff's behavior,[12] weakening any inference that Ms. Doyle was fabricating employee complaints.  Henderson Dep. 27:15-29:9.  Plaintiff disputes the criticism leveled against her, but

---

[11] *See supra* note 6.

[12] Specifically, Ms. El-Nageh told Ms. Henderson that Plaintiff made her uncomfortable and had asked her intrusive questions.  Ms. Henderson took no action on this complaint because Ms. El-Nageh also told her that she had already complained to Ms. Doyle about Plaintiff.  Henderson Dep. 27:15-29:9

an erroneous conclusion by an employer does not violate federal law, only a discriminatory decision does.  And although Plaintiff states that Mr. Devos was positive in their meeting, his testimony that he met with her to provide role clarity is not inconsistent with her account, as he did not deny that he may also have given her encouraging feedback.  Finally, the record reflects that a collaborative process led to Plaintiff's termination, which by its very nature incorporates a variety of perspectives from the individuals involved.

Ms. Coleman's brief tenure also weighs against any finding of pretext: She was hired only one month before her termination by the same individuals who fired her.  Ms. Doyle, the individual that Plaintiff asserts was motivated by racial animus towards her, wrote a glowing review of her job interview and jointly made the decision to hire her, undermining any suggestion that just a week later she would be racially biased against her and falsely report her to HR because of her race.  Though not dispositive, facts establishing that the hirer and firer were the same person, and that the firing occurred shortly after hiring, may weigh against a finding of discrimination. *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 496 n. 6 (3d Cir.1995); *Palma v. Volunteers of Am.*, No. CIV.A. 04-919, 2006 WL 328352, at *6 (E.D. Pa. Feb. 9, 2006) (granting summary judgment where same person who fired plaintiff had "hired her a few months earlier, knowing her age, sex, race and national origin.").  Moreover, replacing Plaintiff with Ms. El-Nageh does not create an inference of race discrimination given that Ms. El-Nageh applied for Plaintiff's position at the same time as Plaintiff and Ms. Doyle initially hired Plaintiff over Ms. El-Nageh.

The racial composition of Plaintiff's management team also weighs against an inference of racial bias.  In her post-termination email, Plaintiff muses that maybe she was not a good fit because of the color of her skin or her dreadlocks.  During Plaintiff's employment, Ms. Doyle supervised four individual managers, three of whom were African American women.  There is no

16

evidence of prior complaints about Doyle.   One of the African American managers, Ms.

Henderson, was deposed.   As a Black employee at Plaintiff's level also supervised by Ms. Doyle,

she denied experiencing any racial discrimination.   Henderson Dep. 10:14-21.

Third, Plaintiff has offered no evidence that Ms. Doyle's lack of confidence in her ability

to lead her team was unfounded.   Multiple sources in the record support that even those employees

who found Plaintiff to be polite and professional questioned her suitability for the position.   *See*

*e.g.,* Henderson Dep. 22:7-9 ("I tried to encourage her to get to understand the organization first

prior to trying to make changes so quickly."); Elsasser Dep. 34:3-7 ("Honestly, knowing that job

and knowing the content and the extent of the work and knowing, you know, Dianna from my

previous job, I wasn't quite sure that she had the experience, background for the position.").

Finally, Plaintiff has provided no evidence calling into question CBH's determination

that she did not understand the purpose of her role.   Specifically, when asked in her deposition if

her role included a quantitative aspect, which it indisputably did, Plaintiff avoided answering and

continued to emphasize the qualitative component.   Coleman Dep. 271:15-18.

Ultimately, "'[t]he question is not whether the employer made the best, or even a sound,

business decision; it is whether the real reason is [discrimination].'"   *Keller,* 130 F.3d at 1109

(quoting *Carson v. Bethlehem Steel Corp.,* 82 F.3d 157, 159 (7th Cir.1996)) (alteration in original).

Here, proof is lacking that Ms. Coleman was treated differently because she was Black.   Her

attempt to cast doubt on CBH's proffered reasons falls short, and taking the record as a whole, a

jury could not reasonably find that racial discrimination was behind the decision.

B.   Summary Judgment is Denied as to Plaintiff's Retaliation Claim

Plaintiff also asserts that she was retaliated against for complaining to Ms. Doyle about

race discrimination.   Title VII makes it unlawful "for an employer to discriminate against any of

his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3. The Supreme Court has held that retaliation claims are cognizable under Section 1981 despite the absence of specific statutory language. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008). And the Third Circuit has held that the legal standards for a retaliation claim under Section 1981 are generally the same as those applicable to a Title VII retaliation claim. *See, e.g., Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001). Plaintiff's PHRA and PFPO claims are reviewed under the same analysis. *Jones v. SEPTA*, 796 F.3d 323, 327 (3d Cir. 2015); *Vandergrift v. City of Phila.*, 228 F. Supp. 3d 464, 486 n. 206 (E.D. Pa. 2017).

To establish a prima facie case of retaliation, a plaintiff must tender evidence that: (1) she engaged in protected activity; (2) the employer took an adverse employment action against her; and (3) "there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia,* 461 F.3d 331, 340–41 (3d Cir. 2006), as amended (Sept. 13, 2006) (cleaned up). "If the employee establishes this prima facie case of retaliation, the familiar *McDonnell Douglas* approach applies in which the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct and, if it does so, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id*. at 342 (cleaned up).

Verbal complaints to management are sufficient to constitute protected activity. *Abramson v. William Paterson Coll. of New Jersey,* 260 F.3d 265, 288 (3d Cir. 2001) (stating that complaints to employer, "whether oral or written, formal or informal, are sufficient to satisfy the first prong

of the prima facie case"). And opposition to unlawful discrimination need not be significant or formal. Rather, the Third Circuit has directed courts to focus on the "message being conveyed rather than the means of conveyance." *Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc.,* 450 F.3d 130, 135 (3d Cir. 2006); *see also Crawford v. Metropolitan Government of Nashville & Davidson County*, 555 U.S. 271, 277 (2009) (observing that the term "opposition" may be used in reference to "someone who has taken no action at all to advance a position beyond disclosing it"). "A plaintiff need not prove the merits of the underlying discrimination complaint, but only that '[s]he was acting under a good faith, reasonable belief that a violation existed.'" *Aman v. Cort Furniture*, 85 F.3d 1074, 1085 (3d Cir. 1989) (cleaned up).

There is a genuine dispute of material fact as to whether Coleman engaged in protected activity. Plaintiff states that during the February 20th meeting with Ms. Doyle, she explicitly complained of racial discrimination. Coleman Dep. 164:8-165:19; 166:4-6. She admits that this was the only time she raised a complaint of racial discrimination to any CBH employee. *Id.* at 168:19-23. Ms. Doyle, on the other hand, denies that Coleman ever reported racial discrimination to her. Doyle Dep. 125:6-15. Plaintiff also asserts that several days later, Ms. Doyle asked her if she felt that Ms. Doyle had ever discriminated against her. Coleman Dep. 236:1-2.

This inconsistency creates a genuine dispute as to a material fact. Defendants attempt to minimize the dispute by highlighting that the only evidence that Ms. Coleman complained of racial discrimination comes from Plaintiff's deposition. Indeed, although the record contains Plaintiff's notes detailing the February 20, 2020 and February 24, 2020 meeting, the notes do not include any mention of reports of discrimination, nor do they reference her allegation that Ms. Doyle asked her if she felt that she had discriminated against her. ECF 23-1, Ex. I. Further, in her email sent to the team two days after her termination, Plaintiff recites a detailed record of her experience at CBH

but does not reference reporting discrimination.  ECF 18-8, Ex. 16.  These omissions, however, are not fatal.  Although the record is weak, a jury could nonetheless believe Ms. Coleman's testimony that she reported racial discrimination.  Any inference related to her decision not to discuss complaining of racial discrimination in her notes or email would go to Ms. Coleman's credibility, which is a jury determination.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

Assuming that Ms. Coleman engaged in protected activity, her termination, which is clearly an adverse action, must also be causally linked to the protected activity. A plaintiff may rely on a range of evidence to demonstrate the causal link between the protected activity and the adverse action, including by showing temporal proximity that is "unusually suggestive of a retaliatory motive." *Shaner v. Synthes*, 204 F.3d 494, 505 (3d Cir. 2000).  The Third Circuit has stated that "[t]hough we generally hold that closeness in time alone cannot establish causation, we have found that close temporal proximity or an added factor making the closeness unusually suggestive can suffice." *Fraternal Ord. of Police, Lodge 1 v. City of Camden,* 842 F.3d 231, 242 (3d Cir. 2016).

Here, Plaintiff's termination, a mere three business days after allegedly reporting racial discrimination, could be unusually suggestive of a retaliatory motive.  During the meeting on February 20, Ms. Doyle did not outwardly appear inclined to terminate Plaintiff, as they scheduled a meeting the next week to address team cohesion issues.  Yet, before that meeting could take place, Plaintiff was terminated.  Such timing could be unusually suggestive. *Compare Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir. 1989) (holding plaintiff had established causation for the purposes of his *prima facie* case merely by showing that discharge occurred only two days after his employer had received notice of employee's EEOC claim) *with Krouse v. Am. Sterilizer Co.,*

126 F.3d 494, 503 (3d Cir. 1997) (standing alone, nineteen months between activity and adverse action was too attenuated to support finding causal link).

A plaintiff may also substantiate a causal connection through other types of circumstantial evidence that support the inference, such as inconsistent reasons for termination. *See Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 280–81 (3d Cir. 2000); *Waddell v. Small Tube Products, Inc.,* 799 F.2d 69, 73 (3d Cir.1986). Here, other evidence in the record, including Ms. Doyle's somewhat strange question as to whether Plaintiff felt that she had discriminated against Plaintiff, and Mr. Devos' positive feedback immediately before Plaintiff allegedly reported racial discrimination, coming just five days before her termination, constitute enough circumstantial evidence to sustain a retaliation claim.

The burden once again shifts to Defendants to assert a legitimate, nondiscriminatory reason for discharging Coleman. As discussed above, Defendants did so, shifting the burden back to Plaintiff to demonstrate "'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' from which a reasonable juror could conclude that the Defendants' explanation is 'unworthy of credence, and hence infer that the employer did not act for the asserted [non-retaliatory] reasons.'" *Carvalho-Grevious v. Delaware State Univ.,* 851 F.3d 249, 262 (3d Cir. 2017) (cleaned up).

Plaintiff's claim is hardly robust. The fact that Ms. Doyle was in conversation with Human Resources about Plaintiff's termination well before Plaintiff complained of any discrimination weakens the inference of pretext. Nonetheless, the suggestive timing and overall context persuade me that summary judgment would be inappropriate, because the circumstances raise an issue of fact as to whether Defendants' proffered reason was pretextual. The fact that termination discussions were occurring prior to Ms. Coleman's report is not dispositive because a reasonable

juror could find that the quick turn-around between the report and termination indicate that her protected activity was the catalyst sparking the decision to terminate.[13]   A jury could infer that, given CBH's agreement that it would take months for Plaintiff to acclimate to her role, her premature termination before she had received a full opportunity to learn how to perform in the position was retaliatory, and that she would not have been terminated after only a month "but-for" her protected activity.

       C.      <u>Summary Judgment is Appropriate for All Claims Against Andrew Devos</u>

Summary judgment is warranted on all claims against Defendant Andrew Devos.  If an individual was "personally involved in the discrimination" or "intentionally caused" the infringement of rights or "authorized, directed, or participated in the alleged discriminatory conduct, they may be held liable" under §1981.  *Al-Khazraji v. Saint Francis Coll.,* 784 F.2d 505, 518 (3d Cir. 1986), *aff'd,* 481 U.S. 604 (1987).  Here, however, Plaintiff has not established that Mr. Devos even knew of Plaintiff's alleged complaint of racial discrimination.  *See* Coleman Dep. 276:17-20 (conceding she does not know if Devos knew of her complaint).  Mr. Devos testified that he was notified of her termination, but not of her complaint of discrimination, and there is no evidence to the contrary.  Devos Dep. 40:16-24; 44:14-23.  Without establishing his knowledge of her protected activity, Plaintiff cannot maintain a claim of retaliation against him.

---

[13] Although the timing and circumstances of termination are also important in establishing plaintiff's *prima facie* case, there is nothing preventing it from also being used to rebut defendant's proffered explanation. "[E]vidence supporting the prima facie case is often helpful in the pretext stage and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 286 (3d Cir. 2000).

**IV.      Conclusion**

For the reasons set forth above, Defendant's Motion for Summary Judgment will be granted as to Plaintiff's race discrimination claim and denied as to Plaintiff's retaliation claims. Summary judgment will be granted as to all claims against Andrew Devos.  An appropriate order follows.

  /s/ Gerald Austin McHugh
United States District Judge
